**RIETMANN & KIM, LLP**
Nathan R. Rietmann, OSB#053630
Daemie M. Kim, OSB #123624
1270 Chemeketa Street NE
nathan@rietmannlaw.com
daemie@rietmannlaw.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

|  |  |
|---|---|
| **MATT ELLIS,**<br><br>Plaintiff,<br><br>v.<br><br>**TILLAMOOK SCHOOL DISTRICT NO. 9**; *a political subdivision of the State of Oregon and public body corporate and,* **KRIS LACHENMEIER,** *an individual;* **MATTHEW PERRY,** *an individual*<br><br>Defendants. | Case No. 3:25-cv-02273<br><br>**COMPLAINT**<br>Federal Question<br>**(28 U.S.C. §1331)**<br>Diversity Action<br>**(28 U.S.C. § 1332)**<br><br>**Demand for Jury Trial** |

## Nature of Action

1.      This is a civil action for damages arising from the wrongful, retaliatory, and contract-breaching conduct of Tillamook School District 9 and individual members of its governing Board in derogation of Plaintiff's due process rights. Plaintiff, a career educational leader, was recruited from out-of-state, induced to relocate and rely on express contractual safeguards, and then systematically undermined, retaliated against, and forced out of his position through coercive, unlawful means.

2.      Over two years, Defendants engaged in a sustained campaign of interference, personal animus, retaliation, intimidation, breach of contract, stigmatizing public statements, and procedurally unlawful actions designed to pressure Plaintiff to resign rather than honor his contract.

3.      When these tactics failed, Board leaders placed Plaintiff on administrative leave without lawful vote, publicly stigmatized him, interfered with his future employment, withheld earned compensation, and ultimately forced a constructive discharge.

4.      Plaintiff's professional reputation, earning capacity, and career trajectory were severely damaged. He lost his superintendent career, suffered significant health impacts, and endured severe emotional and reputational harm.

5.    Plaintiff seeks compensatory damages, punitive damages where allowed, attorney fees, and all other relief available under federal and Oregon law.

## PARTIES

6.     Plaintiff Matt Ellis ("Ellis") is a natural person and citizen of the State of Washington. Plaintiff relocated out of Oregon following the events alleged due to the harm inflicted by Defendants.

7.    Defendant Tillamook School District. No. 9 ("District") is a public school district organized under Oregon law with its principal place of business in Tillamook County, Oregon. It is a citizen of Oregon for diversity purposes.

8.    Defendant Kris Lachenmeier is an individual residing in Tillamook County who at times material served as chair of Defendant's school board. She is being sued in both her personal and official capacity.

9.    Defendant Matthew Petty is an individual residing in Tillamook County who at times material served on Defendant's school board. He is being sued in both his personal and official capacity.

## JURISDICTION AND VENUE.

10.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Washington, all Defendants are citizens of Oregon, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

11.    This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims under 42 U.S.C. § 1983.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b) because all Defendants reside in Oregon and the events giving rise to these claims occurred within this District.

## ALLEGATIONS COMMON TO ALL CLAIMS

13.    In October 2022, the Tillamook School Board removed Superintendent Curt Shelly, and he resigned in November 2022. The Board appointed Jim Mabbott as Interim Superintendent in February 2023.

14.    In March–April 2023, the District conducted a superintendent search. Plaintiff completed interviews and entered contract negotiations with Board members Defendant Matt Petty and Jesse Werner.

15.    The parties negotiated specific contractual protections, including a three-year term, retention bonus, and no cause termination upon payment of 12-months' salary, which terms were designed to provide stability and protect Plaintiff against political volatility or whims of the Board. The Board drafted the contract so that it was deliberately weighted to protect Plaintiff's employment more in the later years of the contract than in the beginning of the contract.

16.    During the negotiations over the contract, the District's Board members involved in the hiring discussed supporting Ellis's doctoral program, related travel,

and professional development. The District's search consultant, Robyn Bean, encouraged Ellis to work with Interim Superintendent Mabbot to acclimate to Oregon and the District since Superintendent Mabbot, at the urging of Defendant Lachenmeier had also been engaged to "coach" the new permanent superintendent for six months.

17.    After Ellis's contract had been negotiated, but before it took effect July 1, 2023, Defendant Petty's wife unsuccessfully applied for an administrative role with the District and Ellis sat through the process with the interview committee.

18.    Sometime in May or June of 2023, before Ellis' contract took effect, Interim Superintendent Mabbott—not Ellis—asked whether Ellis' wife, Dr. Charlotte Ellis, would consider applying for the Director of Teaching and Learning position, previously held by Dr. Tyler Reed (now a superintendent elsewhere). Ellis did not solicit this inquiry, was not involved in the process, and did not recommend her.

19.    Around the same time, Kelsey Petty, wife of Defendant Board member Petty, was not hired for the SPED Director position. This event became a point of personal resentment for Defendant Petty and he openly questioned why Ellis had sat through the interview process for his wife when he was not yet formally under contract with the District.

20.    Meanwhile, Plaintiff Ellis's wife secured employment with the Northwest Regional Education Service District ("NWRESD) to employ Dr. Ellis. NWRESD Superintendent Dan Goldman made the hiring decision to employ Dr. Ellis and did so independently of Plaintiff Ellis. Plaintiff had no role in hiring, supervising, evaluating, or contracting for his wife. The arrangement was expressly structured to avoid nepotism concerns, as her job would involve interface with Defendant District.

21.    Plaintiff began his tenure in July 2023. Immediately, the District experienced turmoil among bus drivers regarding wages and operational leadership. Throughout this time, Defendant Lachenmeier had influence with most of the transportation employees.

22.    Through Summer and Fall 2023, Interim Superintendent Mabbott coached Plaintiff and identified employees needing administrative attention. Plaintiff began addressing these issues consistent with best practices.

23.    In Fall 2023, Board Members Petty and Werner met with Plaintiff. Petty stated: "Either your wife or the new SPED Director needs to go—you pick," indicating personal animus and retaliation tied to his wife's earlier rejection.

24.    Later that fall, largely in response to Defendant Petty's comments, the Board and Plaintiff signed Board–Superintendent Working Agreements clarifying governance boundaries.

25.     Throughout Fall and Winter 2023, the Finance Director improperly communicated directly with Board members contrary to District policy and standard school administrative practice, including Bcc'ing confidential communications. Plaintiff Ellis directed her to stop, and follow proper chain-of-command and governance protocols. She did not do so. The Board undermined Ellis' authority by enabling these communications, which was directly contrary to the Board-Superintendent Working Agreements which had been posted online as a "transparent" commitment to the public.

26.     In November 2023, Plaintiff Ellis was forced to withdraw from his doctoral program due to escalating Board demands and political instability, despite this being something the Board had indicated it would support when inducing him to accept employment.

27.     In early 2024, Ellis led the District toward bargaining with OSEA. The District soon received notice of a new OSEA director.

28.     In March 2024, the Board evaluated Plaintiff Ellis. The evaluation was highly positive and did not reflect any performance deficiencies.

29.     Shortly after the Board evaluated Plaintiff Ellis, Board Member Justin Aufdermauer raised concerns about the book *How the García Girls Lost Their Accents*, initiating a major political controversy that appeared, to Ellis, to be driven by outside pressure. This was an ongoing controversy and the District committed to

a curriculum review that was going to be led by Ellis' wife from the ESD. Notably, around this same time, Defendant Lachenmeir began pushing against Ellis' wife being involved in the work of the District.

30.    Through Spring 2024, contract negotiations with the union deteriorated, and the District retained attorney Nancy Hungerford for support. The primary Board liaisons to the negotiations were Defendant Petty and Justin Aufdermauer. Believing himself to be an expert bargainer due to his prior HR experience, Defendant Petty was combative throughout the negotiations.

31.    In the spring of 2024, Plaintiff addressed IEP caseload concerns in SPED after Kelsey Petty quit mid-year and refused to complete her remaining work. When Plaintiff sought outside assistance to ensure compliance, a District contact told him to "cut the fat," which Plaintiff understood to reference the SPED Director for improper personal or discriminatory reasons. Defendant Petty's involvement in the personnel matter interfered with Plaintiff's ability to manage the situation and aggravated it.

32.    During this period, former Interim Superintendent Mabbot, who was now serving as a resource to Ellis, urged Plaintiff to eliminate several provisional administrators at the District, including the SPED Director, Elementary Principal, Director of Food Service, and Grounds/Transportation Director. Issues and concerns were also expressed about the Communications Director, Executive Assistant, and

Athletic Director. At a Board lunch, where this issue topic arose, Plaintiff Ellis expressed concern about the Board overstepping its bounds on these personnel matters. Defendant Board member Kris Lachenmeier expressed disapproval toward this stating "We hired you, not your wife" as though Ellis' wife was somehow relevant to the issue at hand.

33.    In Spring 2024, two Board members—Kurt Mizee and Jesse Werner— resigned amid growing internal dysfunction on the Board arising from the Garcia Girls book controversy and other issues. New Board members were appointed. Board Chair Lachenmeier contacted the *Oregonian* and engaged in public commentary. The Board voted 4–1 to remove the book.

34.    Meanwhile, contract negotiations with the union worsened. Board Member Petty became emotional and stated he "wanted the union to strike." Board Member Aufdermauer published a video resulting in a Unfair Labor Practices complaint. Board emails became hostile, and the community backlash intensified.

35.    In July/August 2024, Dr. Ellis discovered her pay was incorrect and lower than the prior year. She reasonably believed the Finance Director was retaliating.

36.    In September 2024, significant operational strain continued: new PLC schedules, union activity, and problems with a new food vendor. A local paper also published an article describing Plaintiff as a "Nazi," damaging his reputation. The

controversies for which Plaintiff was being publicly blamed and lambasted were largely attributable to Plaintiff's implementation of Board directives and/or the Board and its members involvement.

37.    In September 2024, Northwest Regional Education Service District Superintendent Dan Goldman informed Plaintiff that Defendant Board Chair Lachenmeier improperly requested Dr. Ellis's ESD contract and scope of work. Goldman refused and redirected her back to Plaintiff, who took exception based on his reasonable belief it was unlawful and contrary to state law for Defendant to be seeking the confidential employment records of his wife from a third party without her consent.

38.    Shortly thereafter, an anonymous anti-union communication—sent using District equipment—resulted in another Unlawful Labor Practices complaint. Plaintiff reasonably suspected improper involvement by the Finance Director but chose not to escalate due to bargaining needs.

39.    In October 2024, the Board approved performance goals not delivered by September 30 as required by contract—constituting a breach. The goals were unilaterally presented by the Board and contained punitive traps and unrealistic timelines.

40.    Soon after, a football incident involving racial slurs became a political flashpoint. The Board engaged former superintendent Randy Schild to conduct an

investigation to get ahead of the story. Defendant Petty and Board member Lewis pressured Ellis to publicly blame the opposing team—an improper directive Ellis rejected. Instead, Plaintiff Ellis worked with the OSAA and Shay James one of the few African American Superintendents in the state to investigate and resolve the matter. During these events, Defendant Petty was quick to point out that his son and was on the team and that another director was a coach, which Plaintiff reasonably understood as a threat to his employment. Defendants also pressured Ellis to issue an apology to the community in relation to the handling of the matter, although Ellis had confirmed and addressed the fact that a District student had used the language at issue during the game.

41.    On October 3, 2024, Defendant Board Chair Lachenmeier met privately with Plaintiff, suggesting he resign and implying that multiple Board members supported removal. She later mistakenly texted Plaintiff Ellis a message intended for Defendant Petty warning that Plaintiff might present a "different version" of their conversation.

42.    On November 1, 2024, Plaintiff  Ellis met with Defendants Petty and Lachenmeier. Defendant Petty stated he would "non-renew [Ellis] right now" and would "lame duck" him rather than buy him out. He again referenced Ellis' wife.

43.    By late 2024, Dr. Ellis accepted employment elsewhere due to Board hostility. Around this same time, former Interim Superintendent Mabbot advised

Ellis that the Board was setting traps for him and intimated the Board was planning to nonrenew him. Mabbot strongly advised Plaintiff Ellis to resign voluntarily as even no-cause termination or a separation agreement would have a negative impact on his career, and his only recourse in the event of termination was litigation, which would not look good to future employers.

44.    Additional controversies followed, including a girls' basketball coaching investigation in which Defendant Petty's brother-in-law was involved. Defendant Petty urged Ellis to resign and spread false accusations in executive session about Plaintiff Ellis' handling of the matter.

45.    In early 2025, former Board member Aufdermauer told Ellis that Defendant Board Chair Lachenmeier falsely told community members Plaintiff was a finalist for another superintendent position.

46.    In March 2025, while pressuring Ellis to leave, the Defendant Board Chair Lachenmeir asked Ellis to prepare public and staff communications about his departure rather than being terminated without cause.

47.    By this point, Board members openly discussed wanting Plaintiff out but refusing to pay contractual severance provided for in his contract in the event of no-cause termination. They considered issuing a negative evaluation "for the record" despite his positive 2024 evaluation as a means of inducing him to resign.

48.    In April 2025, the Board conducted an unfair evaluation. Thereafter, Plaintiff's subordinate employees began monitoring Plaintiff's whereabouts, and multiple administrators asked whether he was being forced out. Upon information and belief, this was being done at the express or implied direction of Defendant Lachenmeir.

49.    During this time, Defendant Board Chair Lachenmeier repeatedly encouraged Plaintiff to take time off and began systematically removing Ellis from real decision-making at the District, communicating instead with subordinate staff.

50.    On April 23, 2025, after rumors spread about Ellis' well-being, numerous staff attempted to locate him. The Board Chair appeared at the District Office seeking him.

51.    Meanwhile, the Finance Director pressed Ellis to fire an OSEA member and when he declined, Board criticism intensified shortly thereafter.

52.    On May 9, 2025, the Board Chair warned that a union vote of no confidence might be used to force Ellis out and expressed doubt he would complete the year.

53.    Significantly, in developing the budget in the spring of 2025, the Finance Director allocated $250,000 to Board legal fees—an unprecedented amount—after private discussions with Board members contrary to District policy and chain-of-command protocol.

54.    During this time, Defendant Board Chair Lachenmeier repeatedly represented to Ellis that the District wanted to negotiate a separation agreement with him so that he could leave on "his terms" without being terminated under the no-cause termination provisions of his contract.

55.    While encouraging Ellis to take time off to take care of his health and systematically circumventing him and empowering other subordinate staff to perform what were properly his roles, Defendant Board Chair Lachenmeir had Ellis' subordinate staff document the things he wasn't doing while he was on protected and authorized leave, and creating the perception with other Board and community members that Ellis was not doing his job in a clear attempt to gain "leverage" over Ellis and assert, without basis, that the Board might have grounds to terminate Plaintiff Ellis for cause.

56.    In June 2025, Defendant Board Chair Lachenmeier emailed attorney Hungerford asking whether there was "any leverage" to remove Plaintiff. Immediately after a closed executive session on June 9, 2025, and without a public Board vote, Plaintiff was placed on administrative leave and notified after the fact via phone and text.

57.    When Ellis made issue of the fact that Board couldn't place him on administrative leave for no reason without even a vote, the Board later "reaffirmed"

the leave in public session, causing additional reputational harm. Social media posts accused Plaintiff of being a pedophile or negligent.

58.    By this time, it was obvious the District had no intention of returning Ellis to employment even though there was no cause to support termination under his contract. When Plaintiff requested that the District simply pay him what it had agreed to pay him in the event of no-cause termination, the Board not only refused but Defendant Board Chair Lachenmeier questioned his "morals and ethics." Defendant was not given any reason as to why he was on administrative leave, or what the District intended to do, other than let him languish while undertaking efforts to find a post hac rationalization upon which it could threaten to terminate him for cause. The facts and circumstances left no doubt that Defendant's intention was to to compel Plaintiff to leave employment for less than the amount to which he was entitled to under his contract in the event of no-cause termination. As there was no explanation for the leave, rumors continually swirled in the community, as the placement on administrative leave publicly communicated that Plaintiff had done something wrong.

59.    By this time, Plaintiff Ellis had endured all that he could stand and it was clear he had, in fact, already been terminated without cause. As a direct result of Defendants' conduct, Plaintiff's reputation as a public-school superintendent in Oregon was destroyed. The stress of the Board's efforts to push him from

employment resulted or compounded stress-related illnesses including kidney stones, COVID, flue episodes, and depression requiring medication.

60.    Plaintiff had been searching for Superintendent jobs without avail, but finally found a lower paying administrative job in Washington where he was originally from and resigned from the District June 30, 2025. The Board thereafter refused to pay his retention bonus, refused to continue negotiating the separation agreement they had been engaging with him in bad faith negotiations over for multiple months, refused to pay what it agreed to pay him in the event of no-cause termination – even though the Board had effectively terminated him without cause. Defendant also continued to undermine him with his new employer in Washington – even after he resigned.

61.    Plaintiff is now employed in a significantly lower-paid position outside Oregon. His marriage, living situation, career prospects, mental health, and professional standing were severely harmed and he has experienced significant emotional distress as a result of the events alleged herein.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

### (Against Tillamook County School District No. 9)

62.    Plaintiff realleges and incorporates paragraphs 1-61 as though fully set forth herein.

63.     Plaintiff and the District entered a negotiated written employment contract in 2023 that:

    a.  Included no-cause termination clause requiring payment of 12-months salary in the event of no-cause termination, making his contract subject to the 12-month notice provisions of ORS 332.505, which require 12-months notice of no-cause termination.

    b.  A unilateral termination structure providing financial protection if the Board removed him for any reason other than documented cause;

    c.  Mandatory goal-setting procedures, including the requirement that performance goals be adopted by September 30 of each contract year;

    d.  A clear evaluation process tied to renewal; and

    e.  Limitations on the Board's ability to place Plaintiff on administrative leave.

64.     Plaintiff fully performed all terms of the contract. His March 2024 evaluation was positive, and he delivered measurable operational improvements, including increased student outcomes, reduced discipline incidents, and successful passage of a major bond measure. His leadership in the union negotiations was critical to the collective bargaining agreement being achieved.

65.     The District materially breached the contract by:

    a.  Failing to implement performance goals by September 30, 2024;

b.  Placing Ellis on administrative leave without a public Board vote in violation of Oregon law and the contractual structure;

c.  Failing to follow the required nonrenewal process, including notice and evaluation procedures;

d.  Interfering with Plaintiff's performance through unauthorized ultra vires Board involvement and failing to honor the terms of the Board-Superintendent Working Agreement as well as his contract delineating the respective duties of the Superintendent and the Board;

e.  Withholding compensation including salary, retention bonus, and benefits, for the full term of the contract or paying the Plaintiff the same to which he was entitled in the event of earlier no-cause termination after providing him 12-months' notice of no-cause termination in accordance with ORS 332.505.

f.  Otherwise treating the contract's protections as obstacles to evade rather than obligations to honor.

g.  Placing Ellis on administrative leave without notice, without explanation,  and without any intention of returning him to work thereby effectively terminating him without cause and without paying him the severance payment and letter to which he was entitled in the event of no-cause termination.

65.    As a direct result, Ellis suffered lost wages, including bonuses, and lost severance, lost benefits, relocation expense, and foreseeably diminished earning capacity.

66.    Ellis is entitled to an award in an amount to be determined at trial, based on the terms of his contract, the 12-month notice requirements of ORS 332.505, together with prejudgment and post-judgment interest at the statutory rate, together with his costs and disbursements herein.

## SECOND CLAIM FOR RELIEF

(Breach of Implied Covenant of Good Faith and Fair Dealing)

(Against Tillamook County School District No. 9)

67.    Plaintiff realleges and incorporates all prior paragraphs herein.

68.    The contract between the parties imposed an implied covenant of good faith and fair dealing requiring the District to act consistently with the reasonable expectations created by the contract's protections.

69.    Plaintiff reasonably expected that:

a. The Board would comply with Oregon law and otherwise not seek to remove him for personal, discriminatory, retaliatory, or otherwise unlawful reasons;

b.  The Board would not attempt to avoid the severance protections by engineering "cause" and would agree to publicly cast any no-cause termination or separation in mutually acceptable light;

c.  The evaluation and renewal processes would be used in good faith;

d.  The Board would not try to publicly cast him in a false public light to evade their contractual obligations;

e.  Separation discussions to modify the terms of the contract would be conducted in good faith;

f.  Administrative leave would be used only as permitted by law and contract.

g.  The Board would adhere to the Board-Superintendent Working Agreement, District policies, and state and federal law;

h.  The Board would not try to undermine him and circumvent his authority and interfere with or usurp the performance of his duties as Superintendent under the terms of his contract.

i.  The Board or its members would not spread false rumors about him in the community or create circumstances that would inevitably have that foreseeable result;

j.  The Board would fulfill its financial obligations to him under the terms of his contract.

70.     The District violated the implied covenant of good faith and fair dealing implied in Plaintiff's contract through the conduct alleged herein and related conduct that will be proven at trial. This conduct includes, but is not limited to:

a.  Depriving Plaintiff of the ability to perform his contract;

b.  Secretly coordinating efforts to coerce Plaintiff to resign without paying him what the District agreed to pay him under the terms of his contract for improper reasons that are contrary to law and public policy;

c.  Otherwise actively seeking "leverage" to push Ellis out of his job without cause and prevent him from fulfilling the terms of his contract or paying him what he was entitled to under the terms of his contract;

d.  Using the evaluation process as an opportunity to leverage Plaintiff out of the District rather than using it to fairly evaluate his performance;

e.  Constructing punitive or unrealistic goals to create pretext;

f.  Pretending to negotiate a separation agreement while intending to force resignation;

g.  Creating rumors and false perceptions regarding Plaintiffs' personal circumstances and employment and job performance;

h.  Weaponizing administrative leave to pressure Plaintiff; and

i.  Withholding compensation;

j.  Holding Plaintiffs' marital status and obligations under the law against him.

71.    These acts deprived Plaintiff of the benefits of the contract and caused economic harm.

72.    As a result of the District's violations of the implied covenant of good faith and fair dealing, Ellis is entitled to an award of damages sufficient to fulfill his reasonable expectations under the terms of his contract including lost wages, benefits, bonuses, retirement contributions, as well as foreseeable consequential damages including moving expenses, loss of earning capacity, reasonable attorney fees and costs and disbursements.

## THIRD CLAIM FOR RELIEF

(Wrongful/Constructive Discharge)

(Against Tillamook County School District No. 9)

73.    Plaintiff realleges all prior paragraphs as though fully set forth herein.

74.    Oregon public policy protects employees—including public-sector executives—from being forced out for refusing to engage in unethical, retaliatory, discriminatory, or unlawful conduct, or taking protected medical leave.

75.    Defendants deliberately and intentionally created intolerable working conditions through the actions alleged herein, and others similar actions that will be proven at trial, including by:

a.  Pressuring Plaintiff to remove employees, including the SPED Director, for improper political or personal reasons;

b.  Repeatedly insisting Plaintiff "choose" between his wife's employment (via NWRESD) and his own job security;

c.  Urging Plaintiff to take discriminatory action ("cut the fat");

d.  Demanding Plaintiff blame outside parties for incidents for political and racially discriminatory reasons;

e.  Interfering with legally and contractually mandated superintendent authority and staff chain-of-command;

f.  Threatening to "lame duck" Plaintiff and refusing to honor his severance protections;

g.  Encouraging Plaintiff to use protected medical leave to take care of his health and then using the tasks he did not complete to threaten termination for cause as a means of leveraging Plaintiff to relinquish his rights under his contract and state law;

h. Unlawfully placing Plaintiff on administrative leave without process or any intent to return to employment, effectively terminating him without cause; and

i. Maintaining an escalating pattern of coercion and humiliation.

76. These conditions, as alleged throughout the complaint and other similar actions to be proven at trial, would compel any reasonable superintendent to resign and did cause Plaintiff Ellis to resign.

77. Plaintiff's constructive discharge violated Oregon public policy and caused substantial economic, emotional, and reputational harm.

78. Plaintiff is entitled to an award of the wages and benefits to which he otherwise was entitled under the terms of his contract but for the wrongful termination as well as noneconomic damages for emotional distress and reputational harm he sustained.

**FOURTH CLAIM FOR RELIEF**

(Whistleblower Retaliation (ORS 659A.199 & 659A.203))

(Against Tillamook County School District)

79. Plaintiff realleges all prior paragraphs as though fully set forth herein.

80. Plaintiff engaged in protected whistleblower activities by reporting, objecting to, or refusing to participate in the activities alleged herein or that will be proven at trial with the good faith belief that such activities were evidence of a

violation of a state or federal law, rule or regulation or mismanagement, gross waste of funds or abuse of authority. Such actions included, but were not limited to:

    a.  Pressure to take discriminatory or retaliatory personnel actions in violation of state law or policy;

    b.  Improper bargaining-related communications by the Finance Director in violation of state law, rule, or regulation;

    c.  Unlawful requests for confidential ESD personnel records in violation of state law, rule or regulation; and

    d.  Misuse of executive session procedures in violation of state law.

81.    In retaliation, Defendants took the actions alleged herein, and others that will be proven at trial, such as:

    a.  Threatened nonrenewal regardless of performance;

    b.  Engineered punitive goal structures;

    c.  Issued an unwarranted and negative public evaluation;

    d.  Pressured Ellis to resign;

    e.  Withheld compensation;

    f.  Interfered with his authority; and

g.  Placed Ellis on administrative leave without legal process, effectively terminating him without cause, and damaging his professional reputation.

82.    Defendants conduct as alleged herein violated ORS 659A.199 & 659A.203.

83.    Defendants' retaliatory conduct has foreseeably caused Ellis embarrassment, stress, humiliation, and other emotional distress together with lost wages, relocation expenses, diminishment of professional reputation, and reduced earning capacity.

84.     Accordingly, Ellis is entitled to an award of economic and non-economic damages in the total amount to be determined at trial, together with prejudgment and post-judgment interest, reasonable attorney fees, costs and disbursements.

**FIFTH CLAIM FOR RELIEF**

(42 U.S.C. § 1983 – Procedural Due Process: Property Interest)

(Against Tillamook County School District No. 9, Lachenmeier and Petty)

85.    Plaintiff realleges and incorporates all prior paragraphs herein.

86.    At all relevant times, Defendants acted under color of state law.

87.    Under the Fourteenth Amendment to the United States Constitution Plaintiff possessed constitutionally protected property interests in his continued employment and in the compensation and contractual protections guaranteed by his written Superintendent contract and Oregon law, including but not limited to: (a) continued employment for the contract term absent lawful termination; and/or (b) the contractually and statutorily required no-cause termination process which, *inter alia*, required one-year notice in advance of no-cause termination, and compensation (including notice/severance pay, benefits continuation, and earned bonuses such as the retention bonus).

88.    Defendants deprived Plaintiff of these property interests when they, inter alia, placed him on administrative leave and effectively terminated his employment/forced his resignation without lawful process and without honoring the contract's no-cause termination protections and compensation, or the requirements of Oregon law (ORS 332.505) requiring 12-months' notice of no-cause termination, including by placing him on leave without a lawful Board vote and without providing timely notice of charges (if any), a meaningful opportunity to be heard, or an adequate pre-deprivation procedure, or an opportunity to clear his name. Defendants' actions alleged herein took place under color of state law and reflect the District's custom, practice, and usage in employment matters.

89.    Defendants' actions were taken pursuant to decisions of Plaintiff's employer's governing body and/or its final policymakers (the School Board and its chair and members acting in that capacity), and therefore constitute the official policy, custom, and/or decision of the District for purposes of municipal liability.

90.    As a direct and proximate result of Defendants' due process violations, Plaintiff suffered economic damages including lost wages, lost benefits, lost bonus compensation, lost severance/notice pay, relocation-related losses, and other damages to be proven at trial.

91.    Pursuant to 42 U.S.C. § 1983, Plaintiff is entitled to economic and non-economic damages for lost salary and benefits and retirement contributions, reduced earning capacity and reputational harm, and emotional distress together with declaratory relief, injunctive relief inclusive of a name clearing hearing, costs, and attorney fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

1. Economic damages in an amount to be proven at trial, including but not limited to past and future lost wages/salary, lost benefits, lost retirement contributions, lost bonuses (including the retention bonus), lost

severance/notice pay and other contractually promised compensation, and other out-of-pocket losses proximately caused by Defendants' conduct;

2. Consequential contract damages recoverable as a matter of law, including relocation-related and other foreseeable losses, to the extent proven;

3. Non-economic damages to the extent permitted by law (including under ORS 659A and § 1983), including emotional distress, humiliation, and reputational harm;

4. Declaratory relief, including declarations that Defendants' conduct violated Plaintiff's rights and/or applicable law;

5. Injunctive / equitable relief as appropriate, including an order requiring a name-clearing hearing and/or prohibiting further dissemination of false stigmatizing accusations, and any other equitable relief the Court deems just;

6. Prejudgment interest as allowed by law, and post-judgment interest as provided by law;

7. Reasonable attorney fees as permitted by law, including but not limited to fees available under ORS 659A.885 and 42 U.S.C. § 1988, in amounts to be determined by the Court;

8. Costs and disbursements incurred herein; and

9. Such other and further relief as the Court deems just and equitable.

10.

DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury upon all issues so triable.

DATED this 5th day of December 2025

**RIETMANN & KIM, LLP**

*/s/ Nathan R. Rietmann*
Nathan R. Rietmann, OSB #053630
Daemie M. Kim, OSB #123624
nathan@rietmannlaw.com
*Attorneys for Plaintiff*